**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BARNETT, *pro se* | |
| Plaintiff, | Civ. No.  10-03871(ES) |
| v. | **O P I N I O N** |
| NEW JERSEY TRANSIT CORPORATION, et al. | |
| Defendants. | |

*Appearances by:*

Anthony Barnett
P.O. Box 1
South Orange, NJ 07079

     *Pro Se Plaintiff*

Noreen Patricia Kemether
Office of the NJ Attorney General
Division of Law
RJ Hughes Justice Complex
25 East Market Street
P.O. Box 112
Trenton, NJ 08625

     *Attorney for Defendants.*

**DEBEVOISE, Senior District Judge**

     This cross-motion for summary judgment arises out of the alleged unlawful employment

discrimination and retaliation of *pro se* plaintiff Mr. Barnett for treatment arises from his

reporting of verbal abuse of his co-worker and fiancé by a supervisor. For the reasons set forth below, the Court grants the cross-motions in part and denies them in part. Specifically, the claims against the individual defendants are dismissed for lack of individual liability arising from Title VII. Additionally, the claims of disparate treatment and hostile work environment are dismissed. However, the claim of unlawful retaliation may proceed because genuine issues of material fact are present as to whether Mr. Barnett engaged in protected activity covered under the Act.

## I. BACKGROUND

Mr. Barnett is a former locomotive engineer trainee in NJ Transit's Locomotive Engineer Training Program ("LETP"). On September 28, 2010, Mr. Barnett filed an Amended Complaint against New Jersey Transit Corporation, New Jersey Transit Rail Operations, Inc. ("NJ Transit") and its employees Norman Allen, a Locomotive Engineer; John Calia, an Instructor Locomotive Engineer; Glen Eagan, Senior Road Foreman of Engines ("RFE"); Sean Kushnir, Senior RFE; Mark Mattis, Senior Training Specialist, and Alan Zahn, Senior RFE. Mr. Barnett asserts claims against Defendants of sex-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

The Amended Complaint refers to two incidents of alleged discrimination – the first is an episode of verbal abuse suffered by Ms. Patrice Hale[1], and the second is an episode of subjective exam administration suffered by Mr. Barnett. A sister case brought on behalf of Ms. Hale is currently pending before the Honorable Esther Salas.

Mr. Barnett, *pro se*, has submitted virtually indecipherable pleadings. Defendants now move for summary judgment as to (1) the claims against the named individuals for want of

---

[1] Ms. Hale was Mr. Barnett's fiancé at the time and is now his wife. Although she now goes by the name Ms. Patrell Barnett, for purposes of this opinion the Court refers to her as Ms. Hale.

individual liability under Title VII; (2) for failure to establish a *prima facie* case of disparate treatment; (3) for failure to establish a *prima facie* case of retaliation under Title VII; (4) and for failure to establish a *prima facie* case of hostile work environment under Title VII.  Relatedly, Defendants contend that Mr. Barnett has failed to establish constructive discharge or entitlement to punitive damages.  In turn, Mr. Barnett clarifies in his opposition brief that his asserted claims are not race-based, and are only in relation to discrimination and retaliation which he suffered as a result of his reporting of sex-based discrimination towards his fiancé, a fellow NJT Locomotive Engineer Trainee.  Due to this point of clarity, the only issue remaining is whether Mr. Barnett's retaliation and discrimination claims can withstand the cross-motions for summary judgment. Oral argument on the cross-motions was heard on June 17, 2011.

Mr. Barnett's LETP class began on December 4, 2007.  The LETP is an 18-20 month training program for Locomotive Engineer students and is designed to train students in all aspects of becoming a locomotive engineer. (Id. at 26:20-25; 283:17-20.)  The LETP evaluates students by both written and verbal examinations on locomotive operation and physical characteristics of various NJ Transit train lines.  Students are given ten days to qualify on a line before the written and verbal examinations.  During this qualifying period, students ride the train line on the head end with a Locomotive Engineer for at least eight hours per day in order to learn the line and the physical characteristic.  (See Hale Dep. 31:16-32:20.)  Following the qualifying period, classroom instructors give students written exams, followed by administration by any available RFE of a verbal exam.

According to the LETP Program Rules, a passing grade of 85% must be met on examinations.  (Murray Cert., Ex. E.)  If a student fails an examination, the student is given one opportunity to retake the exam and must achieve a passing grade of at least 90%.  (Id.)  If a

student does not meet the required passing grade of at least 90% after retaking the examination, the student is subject to termination for failing to adhere to the rules. (Id.)  Mr. Barnett contests that no scored percentage exists for the verbal exams.  The record is unclear on this matter, as the Level II Qualifying Physical Characteristics Record (the "QP Record") for the Hoboken Division only indicates passing or failing scores as to the verbal exam, while showing percentage scores for the written exam. This issue is not a genuine issue of material fact.  Additionally, Mr. Barnett contests the accuracy of the QP Record as to particular notations within it.  However, the disputed excerpts are applicable to notations regarding his co-worker.  As they pertain to Mr. Barnett, no issues of material fact relevant to today's decision are present.

1.  *The verbal abuse of Ms. Hale on October 29, 2008*

Mr. Barnett alleges that he suffered unlawful retaliation after he witnessed and reported verbal abuse by Mr. Zahn, Senior Road Foreman of Engines ("RFE") on board Train 62 during a training exercise with Ms. Hale on October 29, 2008 (the "October 29 incident").  Mr. Barnett witnessed Mr. Zahn verbally abuse his female co-worker and fiancé, Ms. Hale. Specifically, Mr. Barnett observed Mr. Zahn shouting at Ms. Hale "when do you think you're gonna cut in the cab signals." (Barnett Dep. at 36:24-25.)  Additionally, "[w]hen she applied the brakes prior to a speed restriction at Otisville, he shouted at her get this train moving, little lady, you can't stop this train.  These people have to go to work." (Id. at 37:4-8.)  On the same train trip, Mr. Barnett also overheard Mr. Zahn make other offensive comments regarding another female employee of NJ Transit, Ms. Shirley Deliberio.  Specifically, Mr. Zahn told Mr. Allen and Mr. Calia that Ms. Deliberio was a "cunt [and that she] was the worst thing that ever happened to New Jersey Transit." (Id. at 36:2-4.)

Mr. Barnett believes that the October 29 incident was unusual because Ms. Hale was subject to a skills assessment by her supervisor although she had never operated that particular train line. Specifically, Mr. Barnett submits that it was "unusual that [Mr. Zahn] would evaluate her or insist that she operate a train that she had never even operated before on the line with passengers on it." (Id. at 40:17-22.) Mr. Barnett admits that he cannot point to a rule or regulation which indicates if or when a supervisor shall limit appearance on a train that a student never operated before. (Id. at 41:11-15.) However, he notes the "unusual" differential treatment afforded to Mr. Tom Tevlin, a white male trainee and classmate of Ms. Hale's. Mr. Tevlin was afforded different protection when his supervisor, Mr. Herman Acosta, was told that Mr. Tevlin had not yet run the line and was not ready for evaluation. (Id. at 44:16-45:3.)

The October 29 incident is the basis of Mr. Barnett's unlawful retaliation claim. He submitted in deposition:

> [I]f a classmate who is a white male is afforded protection by his instructor who says clearly this student is not ready to be evaluated and that same protection is not afforded to a female African-American student, I think is [sic] discriminatory and I am protected by Title 7 that says clearly – the separate substantive clause that says even if I'm wrong, I believe it was discriminatory, therefore, it is protected activity.

(Bartell Dep. at 46:11-20.)

Ms. Hale's recollection of the October 29 incident largely comports. She testified that at first, Mr. Calia recommended that she wait three days before operating the train in order to learn the specifics of that line. (Hale Dep. 45:18-24, 49:9-12.) Indeed, she was originally assigned to train-handle, which essentially requires less responsibility and more instruction. (Id.) Ms. Hale contends however, that Mr. Calia heavily evaluated her rather than instruct her. Despite his prior indication, Mr. Calia made Ms. Hale operate the train, to which she responded "I don't feel

5

comfortable with this, I've never turned a wheel and I'm not supposed to operate for another two days. He said, well, it wouldn't look good for you if you don't, if you don't operate. I don't know what to tell you." (Id. at 59:6-1.) Ms. Hale contends that she was being criticized for something she had never done. (Id. at 68:14-16.) Ms. Hale describes her state at the time as very nervous and confused. (Id. at 70:7, 71:7.) Additionally, Ms. Hale recalls the other individuals in the train head, Mr. Calia, Mr. Allan, and Mr. Zahn, refer to Ms. Deliberio a "black bitch." (Id. at 86:24-87:1.) Furthermore, she overheard Mr. Calia recount to the two other male co-workers who were in the train-head with Ms. Hale how he made one of his students cry. (Id. at 91:3-5.)

As to the comments which Mr. Calia directed to her, Ms. Hale testified that she asked him where the breaking points were on her line "and I heard nothing. And I looked and I, I, I saw John Calia and I saw a smirk on his face like how is she gonna handle, handle this. So I just – I see myself just getting closer to my forty and I put the brakes on and I put – it's called a full service brake application. And at that point, I started getting yelled at by Mr. Zahn saying what are you – and he's yelling, what are you doing, what are you doing, little lady, you gotta get these people to Hoboken, what – you can't stop the train in the middle of the track." (Id. at 95:1-12.)

2. *Mr. Barnett reports the October 29 incident*

Mr. Barnett alleges that action or inaction by NJ Transit subsequent to his reporting of Ms. Hale's unlawful treatment was pretext for the subsequent discrimination and retaliation which he suffered. Mr. Barnett observed the challenged verbal abuse while either studying and/or qualifying aboard the train with the permission of Mr. Mercogliano. Specifically, Mr. Barnett sat approximately four rows from the open door of the train-head. Upon his arrival in

Hoboken the same day, on October 29, Mr. Barnett reported the allegedly "unusual and biased treatment of another LETP Engineer Trainee" to Mr. Gaskins, Senior RFE. (Am. Compl. ¶ 18.) Specifically, Mr. Barnett told Mr. Gaskins that Mr. Zahn was "verbally abusive" to Ms. Hale, and that Mr. Barnett was told to get off the train. (Barnett Dep. 38:10-19.) The next day, Mr. Barnett also reported the incident to his immediate supervisor, John Smolczynski. Mr. Barnett admits that he did not tell Mr. Smolczynski that Mr. Zahn's actions were harassing or discriminatory, but merely that the assessment was "wrong", and retold the events that had occurred. (Id. at 53:18-55:19.)

   *3.  Immediate aftermath*

Beginning on October 30, 2008, Mr. Barnett allegedly began to receive hostile treatment. According to the Amended Complaint, "[t]he hostilities included being refused entry on locomotives for the purpose of qualifying for the PC exams thereby ensuring his failure." (Id. ¶ 20.) Specifically, on October 30, Mr. Barnett attempted to board westbound Train number 45, when Mr. Ritchie Ulyss, the engineer operating the train, told him to get off the train. (Barnett Dep. 181:20-25.) Mr. Barnett reported the incident to his immediate supervisor, Mr. Smolczynski. According to Mr. Barnett, two unidentified engineers told him to get off their trains on October 31 because he "played the race card." (Id. at 182:9-13.) Mr. Smolczynski suggested that Mr. Barnett start riding in the evenings or off-peak so that he would be away from hostilities. (Id. at 184:24-185:1.)

At 10pm on October 30, Mr. Zahn sent an email to Mr. Roger F. Mannion, stating that "[w]e need to get statements from both Barnett and Hale because the false allegations that they have made are very serious. Based upon conversations with Joey Gaskins and John Calia, these students should be referred to EEO. [ . . . ] Allegations from both of these students are false, and

I feel that my character and J. Calia's character have been questioned by these students, in an

effort to mask their failure to comply with program rules." (BarnettEmails00074, ECF 52-2.)

Around 9:30pm the same evening, Mr. Zahn sent a similar email to Mr. Calia, stating that he

"had a long conversation with Joey Gaskins, and based on statements made by the student, I told

him that the company policy requires him to refer the student engineer to EEO.  In addition,

based upon the statements made by you to the student, company policy requires me to refer you

to EEO." (BarnettEmails00067, ECF 52-2.)[2,3]

---

[2]      NJ Transit's Equal Opportunity in Service and Employment Policy Statement provides in
part:

> Established internal procedures for the resolution of instances of
> possible discrimination:  to ensure the prompt investigation and
> fair resolution of any and all complaints of prohibited or unlawful
> discrimination; and to protect against adverse treatment of an
> employee or applicant who has made a complaint of such
> discrimination.  Employees or applicants who believe they have
> been discriminated against in a manner prohibited by NJ
> TRANSIT's equal opportunity policy should contact their
> supervisor or William Hemphill, Director EE/AA and Diversity
> Programs, One Penn Plaza East, Newark, NJ 07105-2246 or
> telephone (973) 491-8055.

(ECF 52-2 at 31.)

[3]      Certain text messages dated November 7 have been entered into the record via deposition
and exhibit.  It should be noted that the exhibits are inscrutable.  Defendants argue that the
messages should not be considered upon this motion for summary judgment because they are
inadmissible hearsay testimony.  The text messages were received by Ms. Hale by a fellow
classmate, and Ms. Hale shared them with Mr. Barnett.  The text discloses a rumor that Mr.
Eagan indicated to a third-party engineer, Vernon Davis, that Ms. Hale or Mr. Barnett would be
terminated during the next qualifying period. (Hale Dep. 149:3-151.)  The text message also
includes the following:

> Keep your head up from November 7th. [Id. at 225:2-3]. . . There
> is a good ol' boy club going on here, has been for years, I don't
> know how it can be changed, the club doesn't include minorities.
> That . . . [is] why they have opened the hiring [field] . . .
> [inscrutable] . . . They . . . make it appear as if we can't handle the
> stress of the job.  Going to pray this blows over real soon.  You
> will be certified.  This shall pass."

### 4. Mr. Barnett's first reporting of alleged subjective exam administration

From August 12 through November 11, Mr. Barnett failed five oral examinations administered by Mr. Kushnir. When he retook the first three oral examinations with other administrators, he passed them. However, he failed two of Mr. Kushnir's November 11 examinations, and then took the reexaminations on November 12 with Mr. Eagan, whom he purportedly also did not trust. Once these examinations were administered a third time by a different supervisor, he passed them. Mr. Barnett also passed the written and oral examinations which were administered by different supervisors on December 11.

After he failed the first examinations on November 11, Mr. Barnett was placed on no-pay status. The suspension was effective November 12, pending the outcome of his reexamination.

On November 11, 2008, for the first time, Mr. Barnett complained to Mr. Smolczynski about the "subjective and discriminatory manner" in which the verbal examination was administered, and complained of a violation of Rule 4 of the Program Rules of the NJ Transit Rail Operations Training Department Locomotive Engineer Training Program. (Barnett Dep.,

---

(Hale Dep. 220:15-221:8, 223:20-25; <u>see</u> <u>also</u> Text Messages, Ex. I, ECF 49-8.)

Defendants contend that because Mr. Barnett does not know Vernon Davis and because Ms. Hale never spoke to Mr. Davis, the text messages are inadmissible hearsay statements which cannot defeat summary judgment. (<u>See</u> Defs.' MSJ Br. at 23.) <u>See</u> <u>Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.</u>, 826 F.2d 1335, 1339 (3d Cir. 1987) ("Summary judgment . . . looks only to admissible evidence."). According to Fed. R. Ev. 801, "Hearsay" is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

The Court finds that Defendants have shown good cause that the text messages are inadmissible hearsay as they are currently presented. The Court renders no opinion at this time as to whether the general sentiment in the text message regarding a culture of a "good ol' boy club" may be admitted in a different admissible form at a future time, for example perhaps as relevant "me too" evidence. <u>See</u> <u>e.g.</u>, <u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 383 (2009) ("'Me-too' evidence is "testimony by nonparties alleging discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff."); <u>See</u> <u>generally</u> <u>Ansell v. Green Acres Contracting Co., Inc. v. Humberston</u>, 347 F.3d 515 (3d Cir. 2003). The texts will therefore not be considered at this time.

62:9-63:11, 63:16-25.)   Specifically, Mr. Barnett submits that "certain questions were outside of the scope of necessity.  In addition, there were a couple questions that had more than one answer to 'em.  He asked me about a signal indication and there is – there was more than one possibility [ ] for the answer." (Id. at 65:2-8; See also Hale Dep. 39:12-14.)

The evening of November 11, Mr. Barnett sent an email to his instructor stating that he wished to resign, but was told to report the next day for a retake of the oral examination with Mr. Glen Eagan.  (Barnett Dep. at 67:7-12, 290:1-291:2.)  Mr. Barnett failed that November 12, 2008 retake of the oral exam administered by Mr. Eagan, whom he was also suspicious of, again allegedly for subjective reasons due to more than one correct answer.  (Id. at 220:7, 220:23-221:6.)   Mr. Barnett alleges that the testing methods were discriminatory due to the differences in questions asked of him and his fellow classmates.  (Id. at 231:11-18.)  However, Mr. Barnett admits that he does not have any proof that he was asked questions that were discriminatory that were not asked of others.  (Id. at 239:14-18.)  Ms. Hale also testified as to the unfairness of the exams:  "Just that for some reason some people were asked more questions or more difficult questions while others didn't know anything and just kind of got by."  (Hale Dep. 39:11-14.) Due to his failure of the retake examination, Mr. Eagan immediately terminated Mr. Barnett.  (Id. at 227:16-18.)

On November 13, 2008, Mr. Kushnir sent an email to Mr. Dolan detailing the mistakes Mr. Barnett made on the oral examination as to the NJ Transit Main Line and Southern Tier lines. (Murray Cert., Ex. F.)  Mr. Eagan sent the same to Mr. Dolan later that day. (Murray Cert., Ex. G.)

5. *Mr. Barnet's second reporting of both the October 29 incident, the method of exam administration, and the text messages.*

On November 13, Mr. Barnett and Ms. Hale visited the EEO office together to meet with Mr. William Hemphill, Director of the NJ Transit EO/AA office. During that meeting, they recounted the October 29 incident, the subjective nature of the verbal examinations, and shared the content of the November 7 text messages. (See Hale Dep. 165:19-171:13, 157:5-6.)

Thereafter, a third email on November 13 was sent by Mr. Hemphill to Mr. Mattis to advise him that Mr. Barnett had come in that day "to file an EEO complaint concerning the subjectivity of his most recent oral tests. I need you to stop any actions that would terminate him from the training program until my investigation is complete." (Murray Cert., Ex. O.) As a result of Mr. Hemphill's email, James Samuelson, the Deputy Manager of Safety and Transportation, informed Mr. Mattis and Mr. Smolcynzski that Mr. Barnett would be given one more attempt to pass his oral examination, with an administrator other than the two he previously failed with. (Murray Cert., Ex. M.)

Thus, Mr. Barnett was reinstated on November 19, 2008, was given an opportunity to take the verbal examination again, and was placed back on pay status. (Id. at 252:14-18; Murray Cert., Ex. J.) On November 24, 2008, Mr. Barnett was administered ML & ST verbal exam labeled third attempt by RFE Dave Dubose, and passed. (See NJ Transit Record, Pl.'s MSJ Br., ECF 52-1 at 23.) Thus, Mr. Barnett was given this opportunity to retake the examination a second time, despite the fact that the program rules of the LETP provide for only one re-take examination prior to termination. (Defs.' SOMF ¶¶ 72-73; Murray Cert., Ex. M.)

6. *Mr. Barnett's resignation*

Despite having passed multiple tests since reporting his complaints to Mr. Hemphill, on December 22, 2008, Mr. Barnett left a voicemail for Mr. Smolcynzski notifying him that he was resigning. (Barnett Dep. at 293:5-9.) On December 29, 2008, Mr. Barnett submitted the required

formal letter of resignation. His letter did not refer to any claims of discrimination or retaliation, but thanked NJ Transit for the opportunity. (Murray Cert., Ex. L.)

Mr. Barnett alleges that he resigned following threats of violence that were made to Ms. Hale by Ms. Eagan approximately one month earlier on November 22, 2008. (Barnett Dep. at 283:24-285:23.)

    7. *Threat of violence*

According to Ms. Hale, on November 22 she was assigned to train-handle with a named new engineer who was not approved, while her regular crew was assigned to a different location. (Hale Dep., 185:17-7.) She then called Mr. Eagen to express her hesitancy given the circumstances that the new engineer could not take students. (Id. at 186:17-187:7.) Mr. Eagen thus instructed her to simply observe instead of train-handle. (Id. 189:8.) Mr. Eagen then called the engineer back, and the engineer held the phone so that she could hear. (Id. at 195:8-9.) Ms. Hale heard Mr. Eagan "say directly, he said don't, don't say any racist or sexist jokes around her, she'll call the EEOC on you, she's already contacted the EEOC and she'll report you in a heartbeat." (Id. at 190:23-191:3.)

According to Ms. Hale, the engineer thereafter warned her:

> [B]e careful around [Mr. Eagen]. He said make sure whenever
> you're with him whenever possible have a recorder. He said he's –
> and I didn't know where this was coming from and why he was
> telling me, but he said he can be violent. He said he's, he's um . . .
> he's had problems with, with . . . I, I don't k now if he said with his
> ex-wife, I don't know if he said other women. He said be careful.
> He said whenever you're around him, if – whenever possible you
> want to have a recorder.

(Id. at 191:8-21.) After the train reached Hoboken to make a fuel move, Ms. Hale got off the train to call her instructor to be released from the day's duties, however was notified that Mr. Eagan instructed that she report to him at the Control Center. (Id. at 193:8-194:8.)

When Ms. Hale reported to the Control Center, she found herself alone with Mr. Eagan and a pitbull-like dog which weighed fifty to one hundred pounds. (Id. at 196:5-15, 198:7-9.) Ms. Hale recounts the conversation therein as follows:

> [Mr. Eagan] started asking me about what happened on the 29th and he started saying, well, you know, if you were given a chance to, to go through all this all again, you wouldn't do it this way, right, you wouldn't say anything and I said, no, I most absolutely would say something. I didn't say anything wrong. I said, like, I felt there were rules that were being broken and no one has . . . no one has looked into anything, no one has looked into what I've said and I absolutely would do it, I absolutely would say something again.
> And he said, oh, oh, I can understand that because you know – and he looked me direct in the eye and he said because if, if someone puts my back up against the wall and makes me uncomfortable, you know, I can get violent if I have to as well and I took that to mean, don't, don't . . . don't do anything to make me get violent with you."

(Id. at 201:5-24.) According to an email from Mr. Mattis to Mr. Samuelson, Ms. Hale resigned her position on or about December 12, stating "that the job wasn't for her." (ECF 68 at 4)

Mr. Barnett was not present for this November 22 episode, however Ms. Hale told him "that [Mr. Eagan] said something to the extent that he could, he could or would get violent if he had to." (Barnett Dep. at 285:7-287:4.)

*8. The EEOC Complaint*

On or around May 14, 2009, Mr. Barnett filed a timely charge of sex and race discrimination and retaliation against NJ Transit with the Equal Employment Opportunity Commission ("EEOC"). The charge reads that "in the early stages of the run Patrell was subjected to verbal abuse via sexist, racist and profane language from her Instructor Engineer John Calia and the two supervisors Alan Zahn RFE and Norman Allen." (Bartell Dep., 299:3-7.) In deposition, Mr. Barnett explained that the only profane language by Mr. Zahn alleged was in

reference to his calling Ms. Deleberio a "cunt" during the October 29 incident. (Id. at 301:12-17.)  The investigation ended after mediation attempts failed and EEOC was unable to conclude that the information obtained established violations of the statutes.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of  law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact. Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999). See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

Moreover, the nonmoving party must show by competent evidence that factual disputes regarding material issues of fact exist. "[O]nly evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995).

Further, the Court must apply a more liberal standard of review to claims presented by a Plaintiff filing *pro se*. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also United States ex. rel

Montgomery v. Brierley, 414 F.2d 552 (3d Cir. 1969). The Third Circuit Court of Appeals advises that a petition made without the benefit of counsel must be read with a measure of tolerance. Wade v. Yeager, 377 F.2d 841, 846 (3d Cir. 1967).

**B. Analysis**

The remaining issues presented are whether Mr. Barnett may proceed in his claims against the individual Defendants, and whether he has met the burden to establish a *prima facie* case of retaliation and discrimination.

**1. The Title VII claims against the individual defendants are dismissed.**

As a threshold matter, to the extent that the Amended Complaint lodges Title VII claims against Defendants Norman Allen, John Calia, Glen Eagan, Sean Kushnir, Mark Mattis and Alan Zahn (collectively, the "Individual Defendants"), summary judgment is granted in favor of Defendants. Individual Defendants as individual employees cannot be held liable under Title VII. Sheridan v. E.I. DuPont de Nemours, 74 F.3d 1439, 1454 (3d Cir. 1996) (holding that "we follow the great weight of authority from other courts of appeals and hold that an employee cannot be sued [under Title VII].") Accordingly, Mr. Barnett's Amended Complaint is dismissed with prejudice against Individual Defendants.

**2. The Title VII Retaliation Claim**

In order to set forth a *prima facie* claim of retaliation under Title VII, Mr. Barnett must prove that 1) he engaged in protected activity; 2) the employer took a materially adverse action against him; and 3) there is a causal connection between the protected activity and the adverse action. See LeBoonn v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 231 (3d Cir. 2007), cert. denied, 553 U.S. 1004 (2008). The anti-retaliation provision of Title VII protects those who "oppose discrimination made unlawful by Title VII . . . ." Moore v. City of Philadelphia, 461

F.3d 331, 341-42 (3d Cir. 2006).  In other words, in order to succeed on his Title VII retaliation claim, Mr. Barnett must have an "objectively reasonable" belief that the activity he opposed constituted unlawful discrimination under Title VII.  <u>Wilkerson v. New Media Tech. Charter Sch.</u>, 552 F.3d 315, 322 (3d Cir. 2008).

To be sure, general complaints of unfair treatment are not considered protected activities for purposes of Title VII.  Defendants attach three unpublished opinions to their reply brief in support of their argument that Mr. Barnett simply complained of unfair treatment, rather than unlawful discrimination which is protected under the Act.  First, in <u>Ferra v. Potter</u>, 324 Fed. Appx. 189 (3d Cir. 2009) (unpublished), a male 46-year old Caucasian postal service worker failed to complete his route on time, and was given an opportunity to correct his behavior.  He failed to do so, and filed an EEOC complaint alleging race, sex, and age discrimination.  The Third Circuit Court of Appeals concluded that his history of filing grievances through his union and complaints through the EEOC did not constitute "protected activity" under the Act because his naked allegations of differential treatment were insufficient.

Similarly, in <u>Fleeger v. Principip</u>, 221 Fed. Appx. 111, 114-115 (3d Cir. 2007)(unpublished), the Third Circuit Court of Appeals upheld the dismissal of a nurse's retaliation claim for want of establishing protected activity.  The appeals court reasoned that Ms. Fleeger's complaint of discrimination based on her diabetes was not protected under Title VII, which bars "race, color, religion, sex, or national origin discrimination." <u>Id.</u> at *115. Additionally, her general complaints of workplace conditions did not amount to protected activity, as they related the requirement to provide care not typically permitted in VA hospitals, and general complaints regarding overworked nurses, denial of vacations, and management's ignoring of nurses' complaints.  <u>Id.</u> at *113.

Third, in <u>Deluzio v. Family Guidance Ctr.</u>, 2010 U.S. Dist. LEXIS 30571 (D.N.J. 2010), a Caucasian woman's complaints of reverse-discrimination by her superior who was an African-American woman did not amount to protected activity. Therein, Ms. Deluzio's complaints "were generally in the nature of the way [her supervisor] spoke to, and treated, her . . . [and] were not specifically tied to any discriminatory practices." <u>Id.</u> at *40. Therein, Ms. Deluzio stated numerous times that her supervisor talked to her "slowly and deliberately as you would to a child;" that her supervisor allegedly spoke "very, very fast and it was hard to understand what she was saying;" and that her supervisor once "allegedly said that she needed case charges and 'clapped her hands' for them to be retrieved." <u>Id.</u> The Court noted that when Ms. Deluzio was asked on separate occasions by management to provide "an explanation or to detail the 'discrimination' first alleged in the January 9, 2006 memorandum" to a higher-up, she "did not provide any details." <u>Id.</u>

Here, Mr. Barnett claims that he engaged in a protected activity on October 29 and 30, 2008, when he verbally complained to Mr. Gaskins, a senior RFE, and Mr. Smolcynski, his immediate supervisor. In those conversations, he retold the details of the recent October 29 incident involving Ms. Hale, including the derogatory comment calling a former NJ Transit employee a "cunt." Mr. Barnett described the occurrence as "verbally abusive" and "wrong." It is undisputed that Mr. Barnett did not use the word "discriminatory." Thus, Defendants argue that Mr. Barnett's failure to describe the October 29 incident as discriminatory is the death-knell of Mr. Barnett's alleged protected reporting of sex and race-based discrimination of Ms. Hale.

Defendants also examine Mr. Barnett's visit to the EEO office on November 13th during which he reported the October 29 incident, the nature of the administration of the verbal exams, and the text messages. Defendants thus argue that "even assuming that the internal complaint

[on November 13] could constitute a protected activity under Title VII, it occurred <u>after</u> the claimed adverse actions in this case: the verbal tests that Plaintiff failed on November 11th and 12th." (Defs.' MSJ Reply Letter Br. at 3) (emphasis in original.) The Court need not examine whether adverse actions prevailed after the November 13 visit. However, they very well may have had Mr. Samuelson not directed a reexamination with a new administrator. Moreover, Ms. Hale was subject to ongoing questionable treatment, including a purported incident of intimidation when she was directed to meet Mr. Eagan alone in the Control Room with a pitbull-like dog and was again verbally threatened. Although that episode was directed at Ms. Hale and not Mr. Barnett, it could have been interpreted as adverse treatment against the engaged couple. In the context of a retaliation claim, a plaintiff must show "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 341 (3d Cir. 2006) (citing <u>Burlington Northern & Santa Fe Ry. v. White</u>, 548 U.S. 53 (2006)).

Regardless, there is enough evidence on the record to suggest a genuine issue of material fact as to Mr. Barnett's exercise of protected activity when he first reported the October 29 incident. On October 29, Ms. Hale was spoken to in a demeaning manner before three male employees while she was a student in training to be an engineer. According to Mr. Barnett and Ms. Hale, Mr. Zahn shouted at her and called her "little lady." Additionally, Mr. Barnett heard Mr. Zahn call another female employee a "cunt." Mr. Barnett and Ms. Hale considered the general episode "unusual" because Ms. Hale was not meant to be evaluated that day, as she had never operated the train before and should have been given less responsibility to observe, which was customary. That custom or policy was implicitly noted by Mr. Zahn in his original

instruction to her to wait three days before operating the train in order to learn the specifics of that line.  Instead, Mr. Zahn had her operate the train and denigrated her through the process.

It is a genuine question of material fact whether Mr. Barnett possessed an "objectively reasonable" belief that the activity which he opposed was beyond general unfair treatment and treaded into the territory of unlawful sex-based discrimination.  <u>Wilkerson</u>, 552 F.3d at 322.  It should also be noted that the record includes emails sent on October 30 by Mr. Zahn, the very individual responsible for the purported verbal abuse and comments, to Mr. Mannion and Mr. Calia (who was also present during the October 29 incident), recommending that Mr. Barnett, Ms. Hale, and Mr. Calia refer to the EEO/AA office due to the "serious" nature of the allegations and because Mr. Zahn and Mr. Calia's character was called into question.  The purpose of the EEO/AA office is "to ensure the prompt investigation and fair resolution of any and all complaints of prohibited or unlawful discrimination; and to protect against adverse treatment of an employee or applicant who has made a complaint of such discrimination."  <u>See</u> Policy, supra, note 3.  Mr. Zahn's acknowledgement of the "serious" nature of the allegations and recommendation of referral to the office responsible for handling discrimination complaints further confirms the conclusion that a genuine question of fact exists here as to Mr. Barnett's objectively reasonable belief that he was opposing gender-based discrimination.

### 3. The Title VII Discrimination Claim.

The next issue is whether Mr. Barnett was a victim of illegal employment discrimination pursuant to Title VII.  In his opposition to Defendants' motion for summary judgment, Mr. Barnett clarifies that he "has not asserted claims of discrimination and retaliation on the basis of his race (African-American) in violation of the Civil Rights Act of 1964 (Title VII).  Rather in Plaintiff's Verified Amended Complaint dated September 28, 2010, Plaintiff alleged that he

suffered discrimination and retaliation due to Plaintiff's reporting of illegal, demeaning, and discriminatory acts. These illegal acts were gender based towards Plaintiff's fiancé who was also a NJT Locomotive Engineer Trainee." (Pl.'s Opp. Br. at 1.)

To the degree that Mr. Barnett's explanation of his case may be interpreted as bringing a sex-based discrimination claim on behalf of his wife, he clearly lacks standing to do so. Indeed, a separate case regarding Ms. Hale is currently pending before Judge Salas. Any adverse consequences which Mr. Barnett may have suffered as a result of reporting the October 29 incident are embodied in his retaliation claim. The Court therefore grants Defendants' motion for summary judgment based on his Title VII discrimination claim, and denies Mr. Barnett's motion for summary judgment as to the same.

### III. CONCLUSION

For the foregoing reasons, Defendants' and Plaintiff's motions for summary judgment are GRANTED in part and DENIED in part:

1. The Title VII claims against the individual defendants are dismissed.

2. The claim of disparate treatment is dismissed.

3. The claim of unlawful retaliation may proceed.

4. The claim of hostile work environment is dismissed.

The Court will enter an order implementing this opinion.


**/s/Dickinson R. Debevoise**
**DICKINSON R. DEBEVOISE, U.S.S.D.J.**


**Dated: June 17, 2013**